**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **TREY A. MONSOUR,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § **CASE NO.**_____ |
| | § |
| **POLSINELLI PC,** | § |
| | § |
| | § |
| **Defendant.** | § |
| | § |
| | § |

**PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Trey A. Monsour ("Mr. Monsour" or "Plaintiff") files his original complaint against Polsinelli PC ("Polsinelli" or "Defendant") as follows:

**I.
PRELIMINARY STATEMENT**

1.      Federal civil rights law protects individuals from discrimination by their employers on the basis of, among other things, age or sex, which includes—as recently recognized by the Supreme Court—sexual orientation.  The legal profession, often criticized for its historical lack of minority representation, has made real and important progress in the hiring and retention of diverse candidates in recent years.  Indeed, law firms frequently tout their commitment to diversity and inclusion in marketing materials aimed at new hires and potential clients.  Often, these materials contain statistics showcasing the demographics of the firm's employees or anecdotes from the firm's ranks.  Unfortunately, some employers, like Defendant, fail to be the progressive workplaces they depict in recruitment and promotional materials.

2.      Defendant Polsinelli is a national law firm with 21 offices and over 800 attorneys. The firm got its start in Kansas City, Missouri, where much of the firm's leadership continues to

1

reside and practice.  In recent years, as Polsinelli expanded its reach into numerous cities across the country, the firm sought to combat its Midwestern, "good old boys" reputation.  In doing so, the firm hoped to make itself more attractive to new clients and communities, and thus improve its economic viability.

3.      In pursuit of this goal, Polsinelli noticeably intensified the promotion of its "commitment" to diversity and inclusion via the firm's website and marketing materials.  For example, "Diversity" appears as one of the few links on Polsinelli's "Firm Overview" page, which states: "The acceptance, pursuit and promotion of diversity and inclusion are core values of Polsinelli."[1]  The firm goes on to state that, "We define diversity to include people from various ethnic, religious, gender, sexual orientation, age, disability and socio-economic backgrounds who offer a mosaic of beliefs, experiences, perspectives and values."  Press releases frequently promote the firm's various initiatives to promote diversity, including citations to the "example" the firm purportedly sets with respect to LGBTQ (lesbian, gay, bisexual, transgender, queer or questioning) representation and inclusion.[2]  Recently, the firm created—and published promotional content regarding— the position of "Chief Diversity and Inclusion Officer."

4.      However, as Polsinelli exalts its virtues to the public, its employees suffer the real-world consequences of the firm's discriminatory and disparate treatment of minority employees. The marketing campaign notwithstanding, Polsinelli maintains low year-over-year diversity statistics among its professionals, which is particularly apparent in the firm's promotion and hiring of individuals to leadership positions.  In 2019, Polsinelli reported at least 72% of its partners were white heterosexual males; 22% of its partners were white heterosexual females; 0% of its partners

---

[1] https://www.polsinelli.com/ourfirm/diversity

[2] https://www.polsinelli.com/newsevents/polsinelli-receives-designation-as-a

were disabled; less than 2% of its of partners were members of the LGBT community; and, at most, 7% were among all other minority groups combined, including veterans.[3]

5.      Another example of Polsinelli's farcical commitment to diversity is its newly promoted "Chief Diversity and Inclusion Officer."  Ironically, this "officer" inhabits no actual position of power at the firm.  According to Polsinelli, he is to "collaborate with Polsinelli's **leadership** to set the firm's diversity and inclusion strategy and goals and help **them** lead implementation."[4]  As with Polsinelli's commitment to diversity more generally, the initiative is nothing more than a marketing ploy.

6.      Plaintiff Trey Monsour is a prominent, well-respected bankruptcy attorney based in Texas.  Mr. Monsour is also a 58-year-old gay male.  In June 2017, Polsinelli offered Mr. Monsour a position as an equity partner in its newly founded Houston, Texas office.  Mr. Monsour accepted and began his new employment with enthusiasm.  Unfortunately, that excitement proved to be short-lived.

7.      From the outset, Polsinelli treated Mr. Monsour differently than other similarly situated non-LGBTQ employees.  Whereas almost all newly-hired partners were invariably provided with associate and administrative support, the firm denied Mr. Monsour these basic resources, despite his repeated appeals to management for help.  When Mr. Monsour voiced his concerns and expressed a need for resources, the responses from firm leadership ranged from total disregard to outright hostility.  Polsinelli's management created an antagonistic work environment in which Mr. Monsour felt isolated and without recourse.

---

[3] https://www.nalpdirectory.com/content/OrganizationalSnapshots/OrgSnapshot_8219.pdf

[4] https://www.polsinelli.com/newsevents/polsinelli-appoints-philip-hampton-ii (emphasis added)

8.     Despite the firm's best efforts, Mr. Monsour performed at a high level, scoring legal victories and adding value to the firm.  In 2018, Mr. Monsour's reputation and dedication resulted in the firm's first-ever Tier 1 recognition in the bankruptcy field by *U.S. News and World Report*. Out of Polsinelli's 21 offices, only the Houston and Kansas City offices achieved Tier 1 status. Prior to Mr. Monsour joining the firm, Polsinelli had no bankruptcy practice in its Houston office. In the years that followed, Mr. Monsour outperformed many of his colleagues across multiple clear, quantifiable metrics.

9.     Nevertheless, Polsinelli continued to take disparate and adverse employment actions against Mr. Monsour.  First, Mr. Monsour's compensation precipitously fell year over year. Further investigation revealed that other attorneys with similar or lesser contributions to the firm were paid higher salaries than Mr. Monsour, or even awarded bonuses when Mr. Monsour was not.  Eventually, Mr. Monsour's partnership was de-equitized.  All the while, the firm continued to block Mr. Monsour's access to firm resources that it routinely provided to other attorneys.  When Mr. Monsour questioned firm leaders about these adverse actions, they were nonresponsive and unable or unwilling to provide plausible rationales for their decisions.

10.     In early 2020, Polsinelli leadership orchestrated a scheme to replace Mr. Monsour with a newly hired, younger, heterosexual woman.  The replacement employee, who knowingly played a key part in the scheme, embarked on a mission to find "dirt" on Mr. Monsour from existing clients and opposing counsel, presumably to later serve as a pretext for dismissal.  Of course, the replacement employee found nothing incriminating about Mr. Monsour.  Nevertheless, on March 31, 2020, Polsinelli leadership wrongfully terminated Mr. Monsour via a phone call, effective immediately.  On the call, Mr. Monsour's supervisor spoke vaguely regarding the reasons

for his dismissal.  When pressed, he said that certain individuals, including specifically the replacement employee, found Mr. Monsour "difficult to work with."

11.     Polsinelli's adverse employment actions were made on the basis of Mr. Monsour's protected age and sexual orientation, a fact starkly punctuated by derogatory comments by firm leaders regarding gay employees that Mr. Monsour overheard firsthand, as well as observations and stories of contemporaneous experiences relayed by Mr. Monsour's colleagues.

12.     Mr. Monsour suffered psychological, emotional, financial, and reputational harm resulting from Polsinelli's orchestrated and blatant misconduct.  Mr. Monsour's experience is, unfortunately, not unique.  After his departure, past and present employees recounted similar stories of discriminatory behavior at the hands of Polsinelli's leadership.

## II.
## PARTIES

13.     Plaintiff Trey Monsour is an attorney licensed to practice in Texas. He is a former employee of Defendant Polsinelli PC. He resides in Dallas, Texas.

14.     Defendant Polsinelli PC is a professional corporation organized under the laws of the State of Missouri.  Defendant has offices, and also regularly offers legal services, in Houston, Texas.  Defendant has more than 15 employees.

## III.
## RELEVANT NONPARTIES

15.     Nonparty Kraig Kohring is an attorney licensed to practice in Missouri. He was at all relevant times and is currently the Real Estate and Financial Services Department Chair at Polsinelli PC.  He resides in Kansas City, Missouri.

16.     Nonparty Chris Ward is an attorney licensed to practice in Delaware.  He was at all relevant times and is currently the Bankruptcy and Financial Restructuring Practice Chair at Polsinelli PC.  He resides in Wilmington, Delaware.

**IV.**
**JURISDICTION AND VENUE**

17.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331, because there are federal questions of law at issue, namely violations of Title VII of the Civil

Rights Act of 1964 and the Age Discrimination in Employment Act. The court has supplemental

jurisdiction over the state law claim.

18.      This court has personal jurisdiction because Defendant maintains a physical office

and continuously conducts business in Houston, Texas.

19.      Venue is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) because a substantial portion

of the unlawful acts giving rise to Plaintiff's claims occurred in Texas.

20.      Venue is proper pursuant to 28 U.S.C § 1391 because Defendant is deemed to reside

in this District and a substantial part of the events and omissions giving rise to the claim occurred

in this District.

**V.**
**EXHAUSTION OF ADMINISTRATIVE PROCEDURES**

21.      Mr. Monsour timely filed with the Equal Employment Opportunity Commission

("EEOC") a charge of sex and age discrimination against Polsinelli.[5]

22.      Mr. Monsour received a Notice of Right to Sue from the EEOC within ninety (90)

days of filing this complaint.[6]

---

[5] Attached as Ex. A.
[6] Attached as Ex. B.

## VI.
## <u>FACTUAL BACKGROUND</u>

**A.**      <u>**Polsinelli Touts Its Commitment to Diversity to Clients and Prospective Employees.**</u>

23.      Defendant Polsinelli is an Am Law 100 law firm with approximately 800 attorneys and $580 million in annual revenue reported as of 2019.[7]

24.      Based in Kansas City, Missouri, Polsinelli has 21 offices across the United States.

25.      Beginning in the early 2000s, the firm focused on growing its national footprint, hiring hundreds of new attorneys across the country and foraying into new practice areas.

26.      For example, in 2016, Polsinelli opened an office in Houston, Texas.  The Houston office's web page highlights the firm's Bankruptcy and Financial Restructuring Practice.[8]

27.      As the firm scaled up, it sought to combat its historical stigma as a stereotypical "fraternity" of good old boys in order to ingratiate itself with progressive clients and communities that emphasize the value of diversity in the workplace.

28.      As such, Polsinelli publicly touts its commitment to diversity.  Polsinelli's representations include commitments to both encouraging diversity in recruiting, as well as ensuring a tolerant and inclusive workplace for employees.

29.      Since at least 2017, Polsinelli's website has stated: "We define diversity to include people from various ethnic, religious, gender, sexual orientation, age, disability and socio-economic backgrounds who offer a mosaic of beliefs, experiences, perspectives, and values."[9]

30.      Since at least 2017, Polsinelli's website has stated: "The acceptance, pursuit and promotion of diversity and inclusion are core values of Polsinelli."[10]

---

[7] https://www.law.com/law-firm-profile/?id=1823&name=Polsinelli
[8] https://www.polsinelli.com/offices/houston
[9] https://web.archive.org/web/20170622105512/http://www.polsinelli.com/ourfirm/diversity
[10] https://web.archive.org/web/20170622105512/http://www.polsinelli.com/ourfirm/diversity

31.     Since at least 2017, Polsinelli's website has stated: "At Polsinelli, we maintain a high-performing, inclusive organization, where all persons can thrive personally and professionally."[11]

32.     Indeed, Polsinelli celebrates its self-proclaimed status as a "diverse and inclusive workplace and culture."[12]

33.     In press release after press release, Polsinelli promotes its commitment to the diversity of its workforce, as well as the inclusive and tolerant workplace it purports to sustain.

34.     In particular, the firm congratulates itself as being an exemplary place to work for members of the LGBTQ community, "setting an example for all of the clients, partners, vendors and organizations with which we work."[13]

35.     For example, Polsinelli celebrates being the recipient of high marks by the Human Rights Campaign's "Corporate Equality Index."  The score is based on a combination of criteria, each of which depend on the existence of policies and procedures that relate to LGBTQ diversity. Notably, the surveys that lead to the analysis are received, in the first instance, by the chief executives of the reviewed companies. The surveys do not rely on input from employees on whether the policies and procedures actually facilitate, encourage, or ensure diversity or inclusion. Discrimination lawsuits, like this one, may potentially affect the score

36.     To any third party relying solely on the firm's carefully curated public image, Polsinelli is an admirable bastion of progressiveness, diversity, and inclusivity.

---

[11] https://web.archive.org/web/20170622105512/http://www.polsinelli.com/ourfirm/diversity
[12] https://www.polsinelli.com/newsevents/polsinelli-receives-designation-as-a
[13] https://www.polsinelli.com/newsevents/polsinelli-receives-designation-as-a

37.     However, despite its rapid growth hiring strategy and marketing of its commitment to diversity, Polsinelli year-over-year maintains low numbers when it comes to the hiring and promotion of minorities to leadership positions when compared to other Am Law 100 firms.

38.     In 2019, Polsinelli reported at least 72% of its partners were white heterosexual males; 22% of its partners were white heterosexual females; 0% of its partners were disabled; less than 2% of its of partners were members of the LGBT community; and, at most, 7% were among all other minority groups combined, including veterans.[14]

39.     In response to criticism, and to bolster its disingenuous campaign on diversity and inclusion, Polsinelli recently publicized its newly created "Chief Diversity and Inclusion Officer" on its website.[15]  Ironically, this "officer" lacks any real authority.  The individual assigned to this role is not among the firm's leadership by any interpretation.  Indeed, according to Polsinelli, the "Chief Diversity and Inclusion Officer" is to "collaborate *with* Polsinelli's *leadership* to set the firm's diversity and inclusion strategy and goals and help *them* lead implementation." (emphasis added).

40.     Unfortunately, Plaintiff Trey Monsour's experience confirms that the firm's stated dedication to the goals of diversity and inclusion is mere pretense.

**B.     Mr. Monsour Enthusiastically Begins His Employment At Polsinelli.**

41.     Mr. Monsour, 58, is a well-respected bankruptcy attorney, with nearly three decades of experience in his field. Mr. Monsour's industry recognitions include being named among the "Best Lawyers in America" for Bankruptcy and Creditor Debtor Rights/Insolvency and Reorganization Law by *Best Lawyers* (2015-2021) and receiving a *Martindale Hubbell* AV

---

[14] https://www.nalpdirectory.com/content/OrganizationalSnapshots/OrgSnapshot_8219.pdf
[15] https://www.polsinelli.com/newsevents/polsinelli-appoints-philip-hampton-ii

Preeminent Rating.  He is currently a partner at a well-respected national law firm in their office located in Dallas, Texas[16].

42.     In Spring 2017, Polsinelli, seeking to expand its Houston practice, courted Mr. Monsour for a position at the firm. Mr. Monsour considered offers from other firms, including a well-recognized national law firm.  Ultimately, Mr. Monsour chose Polsinelli based, in large part, on its professed commitment to diversity and inclusion.

43.     On June 17, 2017, Mr. Monsour accepted an offer to join Polsinelli as an equity partner, based in Houston, Texas, in the firm's Bankruptcy and Financial Restructuring group.  He was eager to contribute to and become a part of the firm.

C.     **From the Outset, Polsinelli Fails To Treat Mr. Monsour In the Same Manner As His Peers.**

44.     Only weeks into his employment, Mr. Monsour received a call concerning a pitch for a potential new legal matter. He reached out to his direct supervisor, Chris Ward, the Chair of Polsinelli's Bankruptcy and Financial Restructuring Group, to seek guidance on how to proceed. Mr. Monsour also sought guidance from the firm's administrative leadership.  No one responded and, as a result, Mr. Monsour was forced to turn the opportunity away, an embarrassing outcome.

45.     Far from an aberration, this experience proved to set the stage for Mr. Monsour's treatment at Polsinelli.

46.     When other partners joined the firm, Polsinelli rolled out the "red carpet treatment." These partners were each provided a team of employees to assist with legal matters that, at a

---

[16] Mr. Monsour is one of three lawyers in his firm's Dallas office recently named to the 2021 Texas Super Lawyers list.

minimum, included an assistant, associate attorneys assigned to their purview, as well as paralegal and staff support.[17]

47.     By contrast, from the start, Polsinelli failed to assign any staff or paralegal support to Mr. Monsour. The little associate support Mr. Monsour did receive was sparse and often withdrawn by Mr. Monsour's supervisors based on a "lack of availability."

48.     When Mr. Monsour was finally assigned an assistant, she was located 745 miles away, in Kansas City.  Mr. Monsour was instructed to communicate with his assistant by email only because she was "too busy" to communicate with him by telephone.  Mr. Monsour never observed another partner at the firm experience such an obvious and deliberate lack of support.

49.     Department and practice group leaders made an effort to integrate other newly hired partners into the firm—if not socially, then professionally.

50.     By contrast, Mr. Monsour's direct supervisors, bankruptcy practice chair Mr. Ward and department chair Kraig Kohring (Mr. Ward's supervisor),[18] made no effort to integrate Mr. Monsour into the firm, his practice group, or department.  In fact, as Mr. Monsour later discovered, his practice group frequently and purposefully conducted meetings without him in attendance.  Of course, this led to Mr. Monsour feeling—and undisputedly being—isolated and further unsupported.

---

[17]   When Polsinelli extended its offer to Mr. Monsour as an equity partner, the firm promised Mr. Monsour that he could hire a paralegal.  Mr. Monsour presented the resume of a very well respected and experienced 50-year old Hispanic bankruptcy paralegal that Mr. Monsour knew and had previously worked with.  The firm reneged on its promise to Mr. Monsour and would not hire a paralegal for the Houston office even though firm's bankruptcy practice group was short staffed.  After much persistence, the firm agreed to bring Mr. Monsour's candidate on a contract basis without benefits, with the understanding that he would become a permanent employee at the beginning of the next calendar year.  Mr. Monsour persuaded that candidate to join the firm.  Rather than promoting this contract paralegal to a permanent position as the firm promised both Mr. Monsour and the paralegal, the firm terminated the contract paralegal without notice to Mr. Monsour until after the termination was effective.

[18] Mr. Kohring is Head of the Financial Services Group, to which Mr. Ward, the Chair of the Bankruptcy and Financial Restructuring Practice reports. Mr. Kohring is based in Kansas City, Missouri.

51.     Through the rest of 2017, Mr. Monsour continued to function without any meaningful assistance.  Polsinelli's failure to support Mr. Monsour resulted in poor originations and productivity that year.

52.     In an attempt to remedy the problems created by Polsinelli's disparate treatment, Mr. Monsour made numerous solicitations to Mr. Ward, Mr. Kohring, and other firm leaders regarding the work environment, citing personal and group productivity concerns.  His appeals for support, for the benefit of the firm and its clients, were rejected out of hand.

53.     Throughout 2018 and 2019, Mr. Monsour continued to make it clear—often in writing—that his work environment was both unacceptable to Mr. Monsour and a disservice to the firm's clients.  Mr. Monsour was repeatedly ignored by firm leadership.

54.     Following Mr. Monsour's pleas for help, his working conditions did not improve—they worsened.

**D.     The Hostile Work Environment Intensifies.**

55.     Even as Mr. Monsour's working conditions continued to deteriorate, he worked tirelessly to add value to the firm and the clients it serves.

56.     In 2018, Mr. Monsour was integral in helping to successfully resolve a lawsuit against Polsinelli, the resolution of which was critical to the firm's financial position. During his involvement, the firm's then-chair, a heterosexual male, made derogatory comments about two other gay attorneys in the firm—stating that, because these attorneys lived together as domestic partners, their compensation should be cumulative, rather than individual.

57.     That same year, Mr. Monsour was a member of a team that secured a crucial win for the firm in connection with a protracted class action lawsuit. Every attorney on the team received a bonus.  Mr. Monsour did not.  Instead, citing "productivity concerns," Polsinelli docked Mr. Monsour's compensation by one-third and de-equitized his partnership.  When Mr. Monsour

inquired as to whether his involvement in the favorable class action outcome was factored into his year-end review, he was ignored.

58.     By year end, Mr. Monsour's positive contributions to the firm were clear.  For the first time, Polsinelli's Houston office, in which Mr. Monsour was the *only* bankruptcy attorney, received a Tier 1 rating by *U.S. News and World Report*.  In fact, when this news came out, bankruptcy chair Mr. Ward wrote to his colleagues, including Mr. Monsour, via email dated November 1, 2018, "[i]t's about f*cking time they recognized us."  The Houston office was one of only two offices at the firm awarded a Tier 1 rating for its bankruptcy practice.  Since Mr. Monsour's departure, the bankruptcy practice at the Houston office has dropped to a Tier 3 rating.

59.     The Houston office's achievement was not a result of any real investment by Polsinelli.  Upon Mr. Monsour's hiring, Polsinelli promised him a commitment to the development of certain practice areas to bolster the reputation and capability of the Houston office.

60.     During Mr. Monsour's tenure at the firm, not a single hire from those practice groups was made.  Although Mr. Monsour regularly made recommendations to senior management about potential new hires, as well as to the firm's lateral attorney hiring department, not a single lead was pursued.

61.     By 2019, the firm's attempts to set Mr. Monsour up for failure grew more obvious.

62.     In one matter, the firm, and specifically department head Mr. Kohring, failed to advise Mr. Monsour of the departure of an attorney working in a substantial capacity on one of Mr. Monsour's matters.  On the morning of an important hearing, Mr. Monsour was alerted to the partner's departure by outside co-counsel.  Mr. Monsour called Mr. Kohring, who was also the departing attorney's supervisor, to notify him of the departure.  Mr. Kohring blithely responded that he knew that the attorney had left the firm.

63.    When Mr. Monsour sought assistance on the urgent matter, Mr. Kohring refused to provide it, and stated (incorrectly) that the firm had gone out on a limb to represent Mr. Monsour's client in the first place, leaving Mr. Monsour to scramble to meet the client's needs.  When Mr. Monsour voiced his concerns about the negative impact the situation could have on the firm and its client, Mr. Kohring dismissed Mr. Monsour by email and, copying another attorney, condescendingly asked Mr. Monsour if he was able to stay "calm."

64.    In another incident, Mr. Ward, chair of Mr. Monsour's group, reassigned the only associate working with Mr. Monsour on a protracted matter without informing him. When Mr. Monsour requested additional associate support, Mr. Ward responded that everyone was too busy to assist him.  An associate that Mr. Ward reported was too busy told Mr. Monsour that she was, in fact, available to work with Mr. Monsour, but was instructed not to by Mr. Ward.

65.    Undeterred, Mr. Monsour continued to perform excellent work on behalf of the firm.  That year, despite the firm's clear refusal to invest in his success, Mr. Monsour had the third highest production rate in the entire practice group and the 24th highest production rate in the firm (comprised of approximately 800 attorneys).  In addition, his originations of client business substantially improved.  In an attempt to circumvent Polsinelli's continued refusal to provide any support, he commuted between Houston and Dallas to accomplish tasks that required firm resources.

66.    Nevertheless, it seemed that no matter how well Mr. Monsour performed, the firm's leadership was determined that he should fail.  Polsinelli continued to withhold support it freely gave to other partners.  Often, partners in leadership positions treated Mr. Monsour with a severe lack of respect, including communicating in a dismissive or even outright derogatory manner.

14

67.     In a strange episode in fall 2019, Polsinelli's Houston office was relocated to a new space in the same building at its existing office.  In the move, Mr. Monsour's business and personal files were "lost."  The explanation from the firm was that the "file must have been thrown away."  No inquiry was conducted.  Among the "lost" files were Mr. Monsour's client files, contracts, and personal files containing his will and powers of attorneys.  No other attorney's files were "lost" in the move.

68.     By this time, Mr. Monsour was keenly aware of the unequal treatment he was receiving.  Other employees began to take notice as well.  As reflected in contemporaneous communications between Mr. Monsour and other employees.

69.     In his 2019 year-end review, despite Mr. Monsour's continued and valuable service, the firm docked his compensation with no bonus, citing his purported failure to answer emails promptly. When Mr. Monsour researched his compensation criteria against another partner with materially equal statistics, Mr. Monsour found that the other partner received a higher salary as well as a $125,000 bonus.

70.     When pressed, firm leadership could not provide any concrete reasons for the disparity.  Mr. Kohring falsely stated that he was unaware that Mr. Monsour lacked support, despite his numerous requests.  After months of ignoring Mr. Monsour's voicemail and email communications, Mr. Ward disingenuously stated he would be more responsive in the future.

71.     Sensing the dishonesty of his supervisors, Mr. Monsour attempted to elicit a promise that if there were any issues with his work in the future, the firm would provide feedback to Mr. Monsour as those issues arose.  The firm never raised any issue with Mr. Monsour until— as described below—the day he was terminated.

E.    **Polsinelli Leadership Schemes To Replace Mr. Monsour.**

72.    As this demoralizing and undeserved treatment persisted, Polsinelli leadership, rather than making even a feeble attempt to support Mr. Monsour, worked secretly to replace him on his own client accounts with a newly hired attorney in the firm's Dallas office.

73.    In late 2019, the firm hired bankruptcy attorney Liz Boydston.

74.    Ms. Boydston is a heterosexual woman and is estimated to be approximately eighteen years younger that Mr. Monsour.

75.    Almost immediately, Mr. Ward instructed Mr. Monsour to get Ms. Boydston as involved as possible on Mr. Monsour's matters.  In turn, Ms. Boydston insisted that Mr. Monsour share his client files, repeatedly affirming to Mr. Monsour that he could trust her.

76.    Strikingly, Ms. Boydston received ample paralegal and administrative support, as well as the blessing of senior attorneys in the group to enlist the help of associates on her matters.

77.    In early 2020, Ms. Boydston sent emails to partners in the Houston office, advising them that she was the Texas bankruptcy partner to whom other attorneys, as well as clients, should direct their communications.  Recipients of these communications shared them with Mr. Monsour.

78.    Ms. Boydston excluded Mr. Monsour from emails with his own clients and opposing counsel in his matters, covertly representing that she would soon be replacing Mr. Monsour.

79.    In these communications, Ms. Boydston attempted to fish out disparaging information about Mr. Monsour in an apparent effort to conceive a pretext for replacing him.  Ms. Boydston sent communications to Mr. Ward regarding Mr. Monsour's matters falsely stating that serious deadlines were in jeopardy and that significant work needed to be done.

80.    When Mr. Monsour learned what was happening, he reached out to Mr. Ward by email, copying senior management and department heads.  The firm ignored Mr. Monsour.

81.     It later became clear that these senior members of the firm's leadership were involved in and behind the scheme to baselessly question Mr. Monsour's competency and transfer his cases to Ms. Boydston.

82.     Notably, no deadlines were missed.  In fact, opposing counsel advised following Mr. Monsour's departure that the success of one case would not have been accomplished without him.  In 2021, two senior employees of Mr. Monsour's former client contacted Mr. Monsour to thank him for what he had done for the company.  One stated that 95% of the success of their case was attributable to Mr. Monsour's efforts.

**F.     Citing Only Amorphous And Unsubstantiated Reasons, Polsinelli Wrongfully Terminates Mr. Monsour.**

83.     On March 31, 2020 at 2:30 p.m., Mr. Monsour received a call from Mr. Kohring, in which he stated that Mr. Monsour's employment was terminated, effective immediately.  When Mr. Monsour asked for a reason for the termination, Mr. Kohring said that Ms. Boydston found Mr. Monsour "difficult to work with."

84.     Given his clear success via various firm and third-party metrics, and lack of prior complaints from colleagues about working with him, Mr. Monsour sought specific examples of the purported reason for his termination.

85.     Mr. Kohring did not cite any examples and provided no further information.

86.     Mr. Monsour was terminated "without cause" pursuant to his employment agreement.

87.     The termination caused further harm to Mr. Monsour, his clients, and his reputation.

88.     Nevertheless, for weeks following Mr. Monsour's departure, Polsinelli enjoyed the benefits of Mr. Monsour's reputation by including his name on public filings.  In fact, Polsinelli sought fees and was paid for services allegedly performed by Mr. Monsour *after* his last day.

89.     Notably, after Mr. Monsour's departure, a partner at Polsinelli reached out to Mr. Monsour's co-counsel in one of his matters and made disparaging remarks about Mr. Monsour's work in an attempt to dissuade a client from allowing files to be transferred to Mr. Monsour's new firm. The statements were knowingly false.  That client remained with Mr. Monsour after his departure and required Polsinelli take a 25% reduction in its fees due to the trouble they caused the client.

90.     As of the date of the filing of this Complaint, despite Mr. Monsour's demands, Polsinelli refuses to deliver to Mr. Monsour client and personal files to which he is entitled.

91.     Since his termination, Mr. Monsour received communications from multiple individuals who received similar discriminatory treatment while employed at Polsinelli. These reports further validate what is clear: The mistreatment he endured at Polsinelli is the result of discrimination on the basis of Mr. Monsour's sexual orientation and age.

## VII.
## CAUSES OF ACTION

### Count One: Violation of Title VII of the Civil Rights Act of 1964

92.     Mr. Monsour incorporates the paragraphs above as though copied verbatim herein.

93.     Plaintiff is a gay man.

94.     Plaintiff is an "employee" as defined by Title VII, 42 U.S.C. § 2000e et seq.

95.     Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e et seq.

96.     Defendant subjected Plaintiff to adverse employment actions, including wrongful termination.

97.     Defendant intentionally and maliciously discriminated against Plaintiff because he is a gay man.

98.     Plaintiff suffered harmed as a result of Defendant's actions.

### Count Two: Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964

99.     Mr. Monsour incorporates the paragraphs above as though copied verbatim herein.

100.     Plaintiff is an openly gay man.

101.     Plaintiff is an "employee" as defined by Title VII, 42 U.S.C. § 2000e et seq.

102.     Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e et seq.

103.     Defendant subjected Plaintiff to a pervasive pattern of abuse, hostility, neglect, disregard, intentional sabotage, penalization, and adverse employment actions.

104.     Defendant's misconduct seriously interfered with Plaintiff's ability to perform his work.

105.     Defendant was on notice of the misconduct.

106.     Defendant did not take any steps to correct or prevent the misconduct.

107.     A reasonable person would find Defendant's conduct abusive and hostile.

108.     Plaintiff suffered harmed as a result of Defendant's actions.

### Count Three: Violation of the Age Discrimination in Employment Act

109.     Mr. Monsour incorporates the paragraphs above as though copied verbatim herein.

110.     Plaintiff was 57 years old at the time of termination, and therefore meets the age requirements to bring this claim as provided 29 U.S.C. § 631(a).

111.     Defendant is an "employer" as defined by 29 U.S.C. § 630(b).

112.     Plaintiff was well-qualified for his employment with Defendant.

113.     Defendant wrongfully terminated Plaintiff.

114.     Defendant replaced Plaintiff with a substantially younger person with inferior qualifications.

115.     Plaintiff suffered harm as a result of Defendant's actions.

**Count Four: Fraudulent Inducement**

116.    Mr. Monsour incorporates the paragraphs above as though copied verbatim herein.

117.    Defendant intentionally misrepresented its commitment to diversity and inclusion in the workplace in order to induce the recruitment of LGBTQ employees.

118.    Plaintiff reasonably relied upon Defendant's representations in choosing to accept his offer of employment from Defendant.

119.    Plaintiff suffered financial harmed as a result of Defendant's actions.

**VIII.**
**DEMAND FOR JURY TRIAL**

120.    Plaintiff hereby demands a trial by jury on all issues of fact to which he is entitled to a jury trial in this action.

**IX.**
**PRAYER**

For all the foregoing reasons, Plaintiff requests that the Court enter judgment in his favor and award him the following relief against Polsinelli:

a.    Compensatory damages, including for emotional distress, suffering, inconvenience, mental anguish, reputational harm, loss of enjoyment of life, and special damages;

b.    Equitable relief, including back pay, taking into account all raises and benefits to which Plaintiff would have been entitled, with prejudgment interest;

c.    Punitive damages in an amount to be determined at trial;

d.    Liquidated damages;

e.    Attorneys' fees and costs;

f.    Costs of court.

Dated: March  30, 2021               Respectfully submitted,
**BREWER, ATTORNEYS & COUNSELORS**

By: _/s/ Robert M. Millimet_
    William A. Brewer III
    Robert M. Millimet
    William A. Brewer IV
    wab@brewerattorneys.com
    rrm@brewerattorneys.com
    wbb@brewerattorneys.com
    1717 Main Street, Suite 5900
    Dallas, Texas 75201
    Telephone: (214) 653-4000
    Facsimile: (214) 653-1015

    **COUNSEL FOR PLAINTIFF TREY MONSOUR**